EDWARD COLLINS ET AL. *v.* ANTHEM
HEALTH PLANS, INC.
(SC 17233)

Borden, Norcott, Katz, Palmer and Zarella, Js.

310

312

Argued February 10—officially released September 6, 2005

*Craig A. Hoover*, pro hac vice, with whom were *Peter R. Bisio*, pro hac vice, and *Michael G. Durham*, for the appellant (defendant).

*William F. Gallagher*, with whom were *William J. Sweeney*, and, on the brief, *Matthew Shafner* and *Hugh D. Hughes*, for the appellees (named plaintiff et al.).

*Opinion*

ZARELLA, J. The defendant, Anthem Health Plans, Inc., appeals[1] from the trial court's class certification[2] order that was rendered following proceedings that were conducted by the trial court pursuant to our remand order in *Collins* v. *Anthem Health Plans, Inc.*, 266 Conn. 12, 67–68, 836 A.2d 1124 (2003). The plaintiffs

---

[1] The plaintiff appealed to the Appellate Court, and we transferred the appeal to this court pursuant to General Statues § 51-199 (c) and Practice Book § 65-1.

[2] The rules governing class actions in Connecticut include General Statutes § 52-105 and Practice Book §§ 9-7 and 9-8. See *Collins* v. *Anthem Health Plans, Inc.*, 266 Conn. 12, 16–17 n.3, 836 A.2d 1124 (2003). General Statutes § 52-105 provides: "When the persons who might be made parties are very numerous, so that it would be impracticable or unreasonably expensive to make them all parties, one or more may sue or be sued or may be authorized by the court to defend for the benefit of all." See footnotes 3 and 4 of this opinion for the text of Practice Book §§ 9-8 and 9-7, respectively.

are orthopedic surgeons and groups of orthopedic surgeons who commenced this action against the defendant in 1999, alleging, inter alia, breach of contract, tortious interference with business expectancies, breach of the implied covenant of good faith and fair dealing, and violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. In *Collins*, we concluded that the trial court had abused its discretion in granting the plaintiffs' motion for class certification as to three subparagraphs of the plaintiffs' second amended complaint (complaint), namely, subparagraphs 20 (b), (g) and (m), because it had failed to undertake the predominance inquiry that is required by Practice Book § 9-8.[3] Id., 46. We further concluded that the trial court improperly had denied the plaintiffs' motion for class certification with respect to their "illegal profiling" allegation, which is set forth in subparagraph 20 (j) of the complaint, on the ground that the plaintiffs' claim was not typical of those of the putative class. (Internal quotation marks omitted.) Id., 65. We remanded the case to the trial court with direction to determine whether the predominance requirement was satisfied with respect to subparagraphs 20 (b), (g) and (m), and to evaluate whether the class certification requirements, other than typicality, were satisfied with respect to subparagraph 20 (j). Id., 67–68. The trial court thereafter concluded that all of these requirements were satisfied and certified the class for subparagraphs 20 (b), (g), (j) and (m), which apply to all counts set forth in the complaint. The defendant now appeals from the trial court's certification order, claiming that the trial court abused its discretion

---

[3] Practice Book § 9-8 provides: "An action may be maintained as a class action if the prerequisites of Section 9-7 are satisfied and the judicial authority finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

because: (1) the plaintiffs did not prove that the commonality and adequacy-of-representation requirements of Practice Book § 9-7[4] were satisfied with respect to the profiling allegation contained in subparagraph 20 (j);[5] (2) it did not apply the appropriate legal standards in evaluating whether the predominance requirement of Practice Book § 9-8 was satisfied with respect to all four subparagraphs; and (3) it failed to comprehend the management difficulties that would arise if this case were tried as a class action. We disagree with the defendant's first claim but agree with its second and third claims. Accordingly, we reverse the order of the trial court certifying the class as to subparagraphs 20 (b), (g), (j) and (m) of the plaintiffs' complaint.

The plaintiffs are eight orthopedic surgeons and four groups of orthopedic surgeons[6] who entered into written agreements with the defendant to provide medical services to persons enrolled in the defendant's health insurance plans. The plaintiffs commenced this action in 1999 and thereafter filed an amended four count complaint, alleging breach of contract, tortious interfer-

---

[4] Practice Book § 9-7 provides: "One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

[5] The defendant also maintains that the plaintiffs did not prove that a class action is a superior method of adjudicating the profiling allegation set forth in subparagraph 20 (j), which also is required to maintain a class action. See Practice Book § 9-8. Because we conclude that the predominance requirement of Practice Book § 9-8 is not satisfied with respect to subparagraph 20 (j), we need not consider whether a class action is a superior method of adjudicating that claim.

[6] The plaintiffs named in the complaint were Edward Collins, Michael Connair, Scott Gray, Ronald Ripps, John J. O'Brien, Joseph Zeppieri, Kristaps J. Keggi, John M. Keggi, Connecticut Family Orthopedics, P.C., Hartford Orthopedic Surgeons, P.C., Connecticut Sports Medicine and Orthopaedic Center, P.C., and Orthopaedic Surgery, P.C.

ence with business expectancies, breach of the implied covenant of good faith and fair dealing and a violation of CUTPA. Each of these four counts is based on the same sixteen factual allegations that are designated as subparagraphs 20 (a) through (p), inclusive, in the complaint.

In March, 2001, the plaintiffs filed a motion for class certification, seeking to serve as representative parties for all physicians and physician groups who had entered into contracts with the defendant, from 1993 through 2001, to provide medical services to persons enrolled in the defendant's health insurance plans.[7] Id. The trial court granted the motion for class certification, but only with respect to three of the sixteen subparagraphs of the amended complaint. The trial court denied the plaintiffs' motion for class certification as to the remaining thirteen subparagraphs, concluding that either: (1) the plaintiffs did not seek to establish, on their own behalf, the allegations embodied therein and, consequently, their claims were not typical of those of the putative class members; or (2) the allegations "relate[d] to discrete transactions concerning particular services in particular circumstances, with factual issues not common to other such transactions . . . ." Included in the first category was the plaintiffs' profiling allegation contained in subparagraph 20 (j), which provides that the defendant made "payment for services dependent on profiling, a practice whereby treatment and/or payment for covered services for the patient is

---

[7] The plaintiffs' motion for class certification indicated that the plaintiffs were seeking to serve as representative parties for "[a]ll those providers, doctors and physicians who have signed with the defendant [one of several written agreements to provide medical services to persons insured by the defendant]. At a hearing on the motion, the plaintiffs further limited the proposed class to include only physicians, not social workers or other providers who are not medical doctors, who signed such agreements from 1993 to the present." (Internal quotation marks omitted.) *Collins* v. *Anthem Health Plans, Inc.*, supra, 266 Conn. 20.

permitted/disallowed . . . by the use of statistical averages for the treating physician." The court reasoned that this claim lacked the requisite typicality because none of the named plaintiffs had been terminated from the defendant's provider network or denied payment as a result of the defendant's practice of profiling.

The court, however, granted class certification with respect to subparagraphs 20 (b), (g) and (m), which describe general business practices of the defendant that purportedly applied uniformly to all members of the class. Subparagraph 20 (b) alleges that the defendant "[f]ail[ed] to provide the plaintiff[s] and other similarly situated physicians with a consistent medical utilization/quality management and administration of covered services by paying financial incentive and performance bonuses to providers and [the defendant's] staff members involved in making utilization management decisions." Subparagraph 20 (g) avers that the defendant "[f]ail[ed] to maintain accurate books and records whereby improper payments to the plaintiffs were made based on claim codes submitted." Finally, subparagraph 20 (m) alleges that the defendant "fail[ed] to provide senior personnel to work with the plaintiffs or other similarly situated physicians [to secure preauthorization for certain medical services] . . . ." The court determined that these allegations satisfied the threshold requirements of Practice Book § 9-7. The court also determined that these allegations satisfied the superiority requirement of Practice Book § 9-8, concluding that "a class action [was] superior to other available methods for the fair and efficient adjudication of [these claims] . . . ." The court made no finding in accordance with Practice Book § 9-8, however, as to whether "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members . . . ." Despite that omission, the court granted the plaintiffs' motion to certify the

class with respect to subparagraphs 20 (b), (g) and (m). Because the allegations contained in the sixteen subparagraphs are asserted as factual support for each count in the plaintiffs' complaint, the court's certification ruling applied to all four counts.

The defendant appealed and the plaintiffs cross appealed from the order of the trial court granting and denying in part the plaintiffs' motion for class certification. We reversed the trial court's order certifying the class as to subparagraphs 20 (b), (g) and (m) because the trial court had failed to consider the predominance requirement of Practice Book § 9-8. *Collins* v. *Anthem Health Plans, Inc.*, supra, 266 Conn. 46. With regard to the plaintiffs' cross appeal, we held that the trial court improperly had denied the plaintiffs' motion for class certification with respect to subparagraph 20 (j) on the ground that the plaintiffs' claim failed the typicality prerequisite of Practice Book § 9-7. Id., 65. In so holding, we concluded that the trial court had misconstrued subparagraph 20 (j) to require actual termination from the defendant's provider network or denial of payment as a result of the defendant's practice of profiling. Id., 66–67. We read subparagraph 20 (j) liberally and realistically to conclude that the " 'harm' that the representative plaintiffs are alleged to share with the class members is the [profiling] practice itself, which looms as a threat of potential termination or underpayment for services [for all participating physicians]." Id., 67. We therefore concluded that the plaintiffs' claim with respect to subparagraph 20 (j) is typical of those that would be asserted by the putative class. See id. In light of these conclusions, we remanded the case to the trial court for further proceedings. Id., 67–68. Specifically, we directed the court to determine whether the predominance requirement of Practice Book § 9-8 was satisfied with respect to subparagraphs 20 (b), (g) and (m) and, if so, to reinstate the partial class certification order.

Id. We further instructed the court to grant class certification as to subparagraph 20 (j) if it concluded that the requirements of Practice Book §§ 9-7 and 9-8, other than typicality, were satisfied as to that subparagraph. Id., 68.

The trial court thereafter heard arguments on the certification issues that we directed it to consider on remand. During that hearing, the defendant argued, inter alia, that the predominance test required the court to evaluate how the case would be tried in order for the plaintiffs to establish the defendant's liability as to each class member on all four counts. Specifically, the defendant maintained that the court must: (1) review the elements of each cause of action stated in the complaint and determine whether those elements could be established on a class-wide basis with "generalized proof" or whether proof of those elements would require individualized factual inquiries; and (2) weigh the issues involving generalized proof against the issues involving individualized factual inquiries to determine whether the former predominate. The court rejected the mode of analysis advocated by the defendant, concluding that there is "[n]o authority for the broad proposition [that] predominance may only be established by . . . analyzing the proof method to be employed at trial so as to satisfy [the court] that each element of each cause of action [pleaded] can be proven . . . ." The court reasoned, moreover, that such an approach was impermissible because it would require it to "decide the merits of the case . . . ." Instead, the court designed its own predominance test, pursuant to which it described, for each of the four subparagraphs, the purported common issues of law or fact that would arise in a trial on the merits. Applying that test, the court concluded that all of the issues could be proved by generalized evidence that is common to every class member and that the only issue requiring individualized factual proof related

to damages. Noting that "individual consideration of the issue of damages has never been held [to be] a bar to class certification," the court concluded that common questions of law or fact predominate over questions affecting only individual class members with respect to subparagraphs 20 (b), (g), (j) and (m), which, as we noted previously, apply to all four counts of the plaintiffs' complaint.

The court then proceeded to review the remaining class certification requirements, excluding typicality, for subparagraph 20 (j), first concluding that the numerosity requirement of Practice Book § 9-7 was satisfied because the putative class includes approximately 3700 individual providers and 950 professional groups, and, therefore, that joinder would be impracticable. The commonality requirement of Practice Book § 9-7 also was satisfied, the trial court held, in that the defendant's profiling practice applied generally to the entire class, and "[e]ach class member shares the same interest in being free of the threat of termination from the network solely because [he or she] may have been identified as a frequent utilizer of medical procedures . . . ." Finally, the court determined that the plaintiffs adequately could protect the interests of the putative class members, thereby satisfying the adequacy-of-representation requirement of Practice Book § 9-7, and that the class mechanism is a superior method for adjudicating the controversy, as Practice Book § 9-8 demands. The court therefore reinstated the partial class certification order with respect to subparagraphs 20 (b), (g) and (m), and granted class certification with respect to subparagraph 20 (j). This appeal followed.

Before we turn to the defendant's claims, we set forth the standard of review governing class certification orders. A trial court must undertake "a rigorous analysis" to determine whether the plaintiffs have borne the burden of demonstrating that the class certification

requirements of Practice Book §§ 9-7 and 9-8 have been met. (Internal quotation marks omitted.) *Collins* v. *Anthem Health Plans, Inc.*, supra, 266 Conn. 23. A trial court nonetheless "has broad discretion in determining whether a suit should proceed as a class action." (Internal quotation marks omitted.) Id. As long as the trial court "has applied the proper legal standards in deciding whether to certify a class, its decision may . . . be overturned [only] if it constitutes an abuse of discretion." (Internal quotation marks omitted.) *In re Visa Check/Mastermoney Antitrust Litigation*, 280 F.3d 124, 132 (2d Cir. 2001), cert. denied, 536 U.S. 917, 122 S. Ct. 2382, 153 L. Ed. 2d 201 (2002).

"[I]n determining whether to certify the class, a [trial] court is bound to take the substantive allegations of the complaint as true." (Internal quotation marks omitted.) *Collins* v. *Anthem Health Plans, Inc.*, supra, 266 Conn. 24. That does not mean, however, that a court is limited to the pleadings when determining whether the requirements for class certification have been met. On the contrary, we stated in *Collins* that "[t]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the [plaintiffs'] cause of action"; (internal quotation marks omitted) id.; and that "it [sometimes] may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." (Internal quotation marks omitted.) Id. "In determining the propriety of a class action, [however] the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of [the class action rules] are met." (Internal quotation marks omitted.) Id., 24–25. "Although no party has a right to proceed via the class mechanism . . . doubts regarding the propriety of class certification should be resolved in favor of certification." (Citation omitted; internal quotation marks omitted.) *Rivera*

v. *Veterans Memorial Medical Center*, 262 Conn. 730, 743, 818 A.2d 731 (2003).

The rules of practice set forth a two step process for trial courts to follow in determining whether an action or claim qualifies for class action status. First, a court must ascertain whether the four prerequisites to a class action, as specified in Practice Book § 9-7, are satisfied. These prerequisites are: "(1) numerosity—that the class is too numerous to make joinder of all members feasible; (2) commonality—that the members have similar claims of law and fact; (3) typicality—that the [representative] plaintiffs' claims are typical of the claims of the class; and (4) adequacy of representation—that the interests of the class are protected adequately." Id., 738, citing Practice Book § 9-7; accord *Collins* v. *Anthem Health Plans, Inc.*, supra, 266 Conn. 33.

Second, if the foregoing criteria are satisfied, the court then must evaluate whether the certification requirements of Practice Book § 9-8 are satisfied. These requirements are: (1) predominance—that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members"; and (2) superiority—that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Practice Book § 9-8. Because our class certification requirements are similar to those embodied in rule 23 of the Federal Rules of Civil Procedure,[8] and our jurispru-

---

[8] The text of Practice Book § 9-7; see footnote 4 of this opinion; mirrors that of rule 23 (a) of the Federal Rules of Civil Procedure, which provides: "One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

Similarly, the text of Practice Book § 9-8; see footnote 3 of this opinion; tracks the language of rule 23 (b) of the Federal Rules of Civil Procedure,

dence governing class actions is relatively undeveloped, we look to federal case law for guidance in construing the provisions of Practice Book §§ 9-7 and 9-8. See *Collins* v. *Anthem Health Plans, Inc.*, supra, 266 Conn. 32. With this backdrop in mind, we turn to the defendant's claims.

I

We first address the defendant's claim that the trial court abused its discretion in granting class certification to the plaintiffs' claim of profiling contained in subparagraph 20 (j) of the complaint. The defendant contends that the plaintiffs did not prove that the commonality and adequacy-of-representation requirements of Practice Book § 9-7 were satisfied with respect to that claim. We examine each of these requirements in turn.

A

Commonality

The rules of practice provide in relevant part that "[o]ne or more members of a class may sue . . . as representative parties on behalf of all only if . . . there are questions of law or fact common to the class . . . ." Practice Book § 9-7 (2); accord Fed. R. Civ. P. 23 (a) (2). This requirement is easily satisfied because there need only be one question common to the class. See *Collins* v. *Anthem Health Plans, Inc.*, supra, 266 Conn. 34 ("[t]he commonality requirement is met if [the] plaintiffs' grievances share a common question of law or of fact" [internal quotation marks omitted]); see also *Forbush* v. *J.C. Penney Co.*, 994 F.2d 1101, 1106 (5th

which provides in relevant part: "An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

\* \* \*

"(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. . . ."

Cir. 1993) ("[T]he commonality test is met when there is at least one issue whose resolution will affect all or a significant number of the putative class members. . . . For this reason, [t]he threshold of commonality is not high." [Citation omitted; internal quotation marks omitted.]); *Thompson* v. *Community Ins. Co.*, 213 F.R.D. 284, 292 (S.D. Ohio 2002) ("[a]lthough [r]ule 23 [a] [2] speaks of 'questions' in the plural . . . there need only be one question common to the class"). "The common issue [however] must be one the resolution of which will advance the litigation. The commonality requirement is satisfied as long as the members of the class have allegedly been affected by a general policy of the defendant, and the general policy is the focus of the litigation." (Internal quotation marks omitted.) *Thompson* v. *Community Ins. Co.*, supra, 292.

In *Collins*, we construed subparagraph 20 (j), within the context of the plaintiffs' breach of contract claim, to allege that "breach is established . . . through the practice of profiling alone." *Collins* v. *Anthem Health Plans, Inc.*, supra, 266 Conn. 67. We further stated that "the 'harm' that the representative plaintiffs are alleged to share with the class members is the practice itself, which looms as a threat of potential termination or underpayment for services." Id. Thus, the substance and application of the defendant's profiling policy is a question of fact that is common to all members of the class, and the resolution of that issue is necessary to advance the litigation of the plaintiffs' profiling claim. See *Thompson* v. *Community Ins. Co.*, supra, 213 F.R.D. 292. Moreover, all class members would make similar legal arguments in an effort to establish the defendant's liability as to them, namely, that the profiling practice itself constituted a breach of a common term of their contracts with the defendant and gave rise to the other causes of action alleged in the com-

plaint. See *Collins* v. *Anthem Health Plans, Inc.*, supra, 36, 41, 44.

The defendant nevertheless argues that there are no questions of law or fact that are common to the class because its profiling policy changed over time and affected class members in different ways. Thus, according to the defendant, its profiling policy raises "numerous individualized issues" and, therefore, cannot be common to the class. In response to that argument, we first note that, even if the defendant changed its profiling policy periodically, there is no indication in the record that the general policy was not applicable to all physicians during the relevant time period covered by this litigation. Moreover, even if the defendant profiled certain physicians more extensively than others, thereby causing varying degrees of harm among individual class members, that does not render the general profiling policy uncommon to the class. Although the presence of individualized questions is relevant to the predominance and superiority requirements of Practice Book § 9-8, most courts have held that factual variations among class members will not prevent a finding of commonality. See, e.g., *Milonas* v. *Williams*, 691 F.2d 931, 938 (10th Cir. 1982) ("factual differences in the claims of the class members should not result in a denial of class certification" when common question concerning legality of defendant's practices exists), cert. denied, 460 U.S. 1069, 103 S. Ct. 1524, 75 L. Ed. 2d 947 (1983); *Patterson* v. *General Motors Corp.*, 631 F.2d 476, 481 (7th Cir. 1980) (commonality "will not be defeated solely because of some factual variations among [putative] class members' grievances"), cert. denied, 451 U.S. 914, 101 S. Ct. 1988, 68 L. Ed. 2d 304 (1981); *O'Connor* v. *Boeing North American, Inc.*, 180 F.R.D. 359, 372 (C.D. Cal. 1997) ("the fact that individualized issues exist does not defeat a commonality claim, although it may impact the predominance and superior-

ity inquiries"); 1 A. Conte & H. Newberg, Class Actions (4th Ed. 2002) § 3:12, p. 315 ("[t]he fact that class members must individually demonstrate their right to recover, or that they may suffer varying degrees of injury, will not bar a class action [on commonality grounds]"). Thus, we conclude that the commonality requirement is satisfied with respect to the plaintiffs' profiling allegation contained in subparagraph 20 (j) of the complaint.

## B

### Adequacy of Representation

The rules of practice provide in relevant part that class certification may be granted "only if . . . the representative parties will fairly and adequately protect the interests of the class." Practice Book § 9-7 (4); accord Fed. R. Civ. P. 23 (a) (4). "The adequacy-of-representation requirement addresses concerns about the competency of class counsel and conflicts of interest. *Rutherford* v. *City of Cleveland*, 137 F.3d 905, 909 (6th Cir. 1998), citing [*General Telephone Co. of the Southwest* v. *Falcon*, 457 U.S. 147, 157–58 n.13, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982); H. Newberg & A. Conte, Class Actions (3d Ed. 1992) § 3.22, p. 3-126] (The two factors that are . . . recognized as the basic guidelines for the [adequacy-of-representation] prerequisite are . . . (1) absence of conflict and (2) assurance of vigorous prosecution.). The adequacy requirement is met [when] the representatives: (1) have common interests with the unnamed class members; and (2) will vigorously prosecute the class action through qualified counsel. *Senter* v. *General Motors Corp.*, 532 F.2d 511, 525 [(6th Cir.), cert. denied, 429 U.S. 870, 97 S. Ct. 182, 50 L. Ed. 2d 150 (1976)]; *Amchem Prods., Inc.* v. *Windsor*, 521 U.S. 591, 625, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997) (The [adequacy-of-representation] inquiry . . . serves to uncover conflicts of interest between the

named parties and the class they seek to represent.).'' (Internal quotation marks omitted.) *Thompson* v. *Community Ins. Co.*, supra, 213 F.R.D. 294.

The defendant does not challenge the competency of plaintiffs' counsel. Rather, it argues that the plaintiffs are not adequate representatives because a conflict of interest exists within the class. In support of its argument, the defendant notes that the plaintiffs readily admit that neither they nor any other member of the class has ever been terminated from the defendant's provider network or denied payment for services as a result of the defendant's profiling practice. Thus, the defendant posits that the plaintiffs "cannot represent . . . any physicians who may in the future assert that they have been terminated or underpaid because of profiling." Practice Book § 9-7 (4), however, does not require us to consider whether the plaintiffs could amply protect the interests of any physician who might bring an action against the defendant at some unspecified future date because that physician was terminated or denied payment as a result of the defendant's profiling policy. Rather, the plaintiffs simply must be able to protect fairly and adequately the interests of persons or entities who would be included in the putative class, namely, physicians and physician groups who had entered into agreements with the defendant from 1993 until 2001. See *Collins* v. *Anthem Health Plans, Inc.*, supra, 266 Conn. 20 (at 2001 hearing on motion for class certification, plaintiffs sought to limit class to physicians who contracted with defendant from 1993 to date of hearing). Moreover, we indicated in *Collins* that even a liberal reading of subparagraph 20 (j) did not support the notion that termination or underpayment is a necessary component of the plaintiffs' profiling allegation. See id., 67. Rather, "the 'harm' that the representative plaintiffs are alleged to share with the class members is the [profiling] practice itself . . . ." Id. Tak-

ing that allegation as true, as we must, we conclude that the plaintiffs share a common interest with the class insofar as all class members seek to eliminate the *threat* of termination or denial of payment as a result of the defendant's profiling practice. See *Thompson* v. *Community Ins. Co.*, supra, 213 F.R.D. 294. We therefore conclude that the representative plaintiffs' interests in proceeding with the class action are not antagonistic to the interests of the putative class members.

## II

The defendant next claims that the trial court did not apply the proper legal standards when it conducted its predominance inquiry with respect to subparagraphs 20 (b), (g), (j) and (m) of the plaintiffs' complaint. In particular, the defendant contends that the trial court "failed to examine the individualized issues that each class member would have to prove in order to establish liability [for each of the four counts in the complaint] . . . . As a result, the [trial] [c]ourt failed to weigh the individualized issues specific to each class member against the common issues relating to [the defendant's] alleged policies." The defendant further maintains that, if the trial court had conducted its predominance analysis in accordance with established legal standards, such an analysis would have revealed that individualized issues predominate in this case because each class member must prove that he or she was harmed by the challenged policies and that such harm was not attributable to another source.

The plaintiffs counter that all four subparagraphs "implicate only company-wide policies and programs [that] applied to all members of the class." The plaintiffs maintain that, because the theory of their case is that the challenged business practices of the defendant are illegal and harmful to each class member simply by

virtue of their existence, generalized proof concerning these policies will predominate, and the only individualized issue of proof pertains to damages. They further contend that the analytical approach urged by the defendant would necessitate an impermissible inquiry into the merits of the case and is a tactic designed "to divert the court's attention away from common liability questions." We agree with the defendant.

A

The Predominance Requirement of
Practice Book § 9-8

The rules of practice provide in relevant part: "An action may be maintained as a class action if . . . the judicial authority finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members . . . ." Practice Book § 9-8; cf. Fed. R. Civ. P. 23 (b) (3). In *Collins*, we explained that the fundamental purpose of the predominance inquiry is to determine "whether the economies of class action certification can be achieved . . . without sacrificing procedural fairness or bringing about other undesirable results." (Citation omitted; internal quotation marks omitted.) *Collins* v. *Anthem Health Plans, Inc.*, supra, 266 Conn. 50. We stated that "[c]lass-wide issues predominate if resolution of some of the legal or factual questions that qualify *each class member's case* as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." (Emphasis added; internal quotation marks omitted.) Id., 48.

"In order to determine whether common questions predominate, [a court must] . . . examine the [causes] of action asserted in the complaint on behalf of the putative class. . . . Whether an issue predominates can only be determined after considering what value

the resolution of the class-wide issue will have in each class member's underlying cause of action." (Citation omitted; internal quotation marks omitted.) *Rutstein* v. *Avis Rent-A-Car Systems, Inc.*, 211 F.3d 1228, 1234 (11th Cir. 2000), cert. denied sub nom. *Zeirei Agudath Israel Bookstore* v. *Avis Rent-A-Car Systems, Inc.*, 532 U.S. 919, 121 S. Ct. 1354, 149 L. Ed. 2d 285 (2001). "Common issues of fact and law predominate if they ha[ve] a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief. . . . [When], after adjudication of the classwide issues, [the] plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual[ized] claims, such claims are not suitable for class certification . . . . See *Perez* v. *Metabolife Int'l, Inc.*, 218 F.R.D. 262, 273 (S.D. Fla. 2003) (declining class certification in part because any efficiency gained by deciding the common elements will be lost when separate trials are required for each class member in order to determine each member's entitlement to the requested relief)." (Citation omitted; internal quotation marks omitted.) *Klay* v. *Humana, Inc.*, 382 F.3d 1241, 1255 (11th Cir. 2004), cert. denied sub nom. *UnitedHealth Group, Inc.* v. *Klay*, 543 U.S. 1081, 125 S. Ct. 877, 160 L. Ed. 2d 825 (2005).

"[N]umerous [federal] courts have recognized [however] that the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate." *Allapattah Services, Inc.* v. *Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003), aff'd sub nom. *Exxon Mobil Corp.* v. *Allapattah Services, Inc.*, 545 U.S. 546, 125 S. Ct. 2611, 162 L. Ed. 2d 502 (2005). In assessing the predominance requirement in cases involving individualized damages, "the [c]ourt's inquiry is limited to whether . . . the proposed methods [for computing damages] are so insubstantial as to amount to no method at all . . . . [The plaintiffs] need

only come forward with plausible statistical or economic methodologies to demonstrate impact on a class-wide basis." (Internal quotation marks omitted.) *Klay v. Humana, Inc.*, supra, 382 F.3d 1259, quoting *In re Terazosin Hydrochloride Antitrust Litigation*, 220 F.R.D. 672, 698 (S.D. Fla. 2004). "Particularly [when] damages can be computed according to some formula, statistical analysis, or other easy or essentially mechanical methods, the fact that damages must be calculated on an individual basis is no impediment to class certification.

"It is primarily when there are significant individualized questions going to liability that the need for individualized assessments of damages is enough to preclude [class] certification. See, e.g., [*Sikes* v. *Teleline, Inc.*, 281 F.3d 1350, 1366 (11th Cir.)] (These claims will involve extensive individualized inquiries on the issues of injury and damages—so much so that a class action is not sustainable.) [cert. denied sub nom. *Sikes* v. *American Telephone & Telegraph Co.*, 537 U.S. 884, 123 S. Ct. 117, 154 L. Ed. 2d 143 (2002)]; [*Rutstein* v. *Avis Rent-A-Car Systems, Inc.*, supra, 211 F.3d 1234, 1240] (declining to certify a class because most, if not all, of the plaintiffs' claims will stand or fall . . . on the resolution of . . . highly case-specific factual issues and liability for damages is a necessarily individualized inquiry)." *Klay* v. *Humana, Inc.*, supra, 382 F.3d 1259–60; see also *Kohn* v. *American Housing Foundation, Inc.*, 178 F.R.D. 536, 542–44 (D. Colo. 1998) (class certification inappropriate because injury suffered by each class member was highly individualized and could not be separated from causation inquiry).

These standards inform us that a court should engage in a three part inquiry to determine whether common questions of law or fact predominate in any given case. First, the court should review the elements of the causes of action that the plaintiffs seek to assert on behalf of

the putative class. *Rutstein* v. *Avis Rent-A-Car Systems, Inc.*, supra, 211 F.3d 1234. Second, the court should determine whether generalized evidence could be offered to prove those elements on a class-wide basis or whether individualized proof will be needed to establish each class member's entitlement to monetary or injunctive relief. *Klay* v. *Humana, Inc.*, supra, 382 F.3d 1255. Third, the court should weigh the common issues that are subject to generalized proof against the issues requiring individualized proof in order to determine which predominate. See *Collins* v. *Anthem Health Plans, Inc.*, supra, 266 Conn. 48. Only when common questions of law or fact "will be the object of most of the efforts of the litigants and the court" will the predominance test be satisfied. *Snyder Communications, L.P.* v. *Magana*, 142 S.W.3d 295, 300 (Tex. 2004).

The trial court did not conduct its analysis in this manner because it improperly concluded that there was no authority for such an approach and that it would require an impermissible inquiry into the merits of the case. Because our review of the record reveals that additional fact finding is not required to resolve the predominance issue, and because both parties have fully briefed the issue, we conclude that "a final resolution of the defendant's appeal will best serve the interests of judicial economy." *State* v. *Hamilton*, 228 Conn. 234, 246, 636 A.2d 760 (1994). Thus, rather than remand the case to the trial court for another predominance determination, we proceed to evaluate the predominance requirement ourselves pursuant to the foregoing standards. See *Castano* v. *American Tobacco Co.*, 84 F.3d 734, 744–45 (5th Cir. 1996) (performing predominance analysis on appeal after concluding that District Court had failed to apply proper legal standards in evaluating predominance requirement of Fed. R. Civ. P. 23 [b] [3]). We begin by setting forth the elements of the

causes of action that the plaintiffs allege in their complaint.

## B

### The Causes of Action

The plaintiffs seek to litigate four causes of action on behalf of the putative class members. These include: (1) breach of contract; (2) tortious interference with business expectancies; (3) breach of the implied covenant of good faith and fair dealing; and (4) violation of CUTPA.

In order to establish that each putative class member is entitled to damages stemming from the defendant's alleged breach of contract, the plaintiffs must prove that: (1) the defendant and the class member formed an agreement; (2) the class member performed under the agreement; (3) the defendant breached the agreement; and (4) the class member incurred damages. E.g., *Rosato* v. *Mascardo*, 82 Conn. App. 396, 411, 844 A.2d 893 (2004). Furthermore, the plaintiffs must prove that the damages sustained by each class member were caused by the breach and were not the product of some other source. E.g., *West Haven Sound Development Corp.* v. *West Haven*, 207 Conn. 308, 314, 541 A.2d 858 (1988) ("to be entitled to damages in contract a plaintiff must establish a causal relation between the breach and the damages flowing from that breach" [internal quotation marks omitted]).

With respect to the third count, which also sounds in breach of contract, we have stated that "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." (Internal quotation marks omitted.) *Warner* v. *Konover*, 210 Conn. 150, 154, 553 A.2d 1138 (1989). "To constitute a breach of [that duty], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits

that he or she reasonably expected to receive under the contract must have been taken in bad faith. . . . Bad faith means more than mere negligence; it involves a dishonest purpose." (Citations omitted; internal quotation marks omitted.) *De La Concha of Hartford, Inc.* v. *Aetna Life Ins. Co.*, 269 Conn. 424, 433, 849 A.2d 382 (2004).

In order for each putative class member to prevail on the second count, namely, tortious interference with business expectancies, the plaintiffs must prove that: (1) a business relationship existed between the class member and the class member's patients; (2) the defendant intentionally interfered with that business relationship while knowing of its existence; and (3) the class member suffered an actual loss as a result of that interference. See, e.g., *Solomon* v. *Aberman*, 196 Conn. 359, 364, 493 A.2d 193 (1985).

Finally, in count four, which alleges a violation of CUTPA, the plaintiffs must prove that: (1) the defendant engaged in "unfair or deceptive acts or practices in the conduct of any trade or commerce"; General Statutes § 42-110b (a); and (2) each class member claiming entitlement to relief under CUTPA has suffered an "ascertainable loss of money or property" as a result of the defendant's acts or practices. General Statutes § 42-110g (a). "The ascertainable loss requirement is a threshold barrier which limits the class of persons who may bring a CUTPA action seeking either actual damages or equitable relief." *Hinchliffe* v. *American Motors Corp.*, 184 Conn. 607, 615, 440 A.2d 810 (1981). "Thus, to be entitled to any relief under CUTPA, a plaintiff must first prove that he has suffered an 'ascertainable loss' due to a CUTPA violation."[9] *Larobina* v. *Home*

---

[9] CUTPA expressly addresses class actions. Specifically, General Statutes § 42-110g (b) provides: "Persons entitled to bring an action under subsection (a) of this section may, pursuant to rules established by the judges of the Superior Court, bring a class action on behalf of themselves and other persons similarly situated who are residents of this state or injured in this

*Depot, USA, Inc.*, 76 Conn. App. 586, 593, 821 A.2d 283 (2003). We emphasize that, in order for a class member to obtain relief from the defendant under any of the four causes of action, the plaintiffs must prove, inter alia, that that class member suffered a loss that was caused by the challenged policies of the defendant.

The plaintiffs argue, and the trial court agreed, that all of the elements of the four causes of actions that bear on the defendant's liability to each class member turn on common questions of law or fact that can be proved by generalized evidence. Most notably, the trial court found that the plaintiffs could proffer generalized evidence to show that: (1) the defendant, by virtue of its adoption of the challenged policies, breached a common term of the class members' contracts; (2) the defendant adopted those policies in bad faith and with the intent to deprive class members of their benefits under the contracts; (3) the defendant adopted those policies with knowledge of, and with the intent to interfere tortiously with, the class members' relationships with their patients; (4) the policies constituted unfair or deceptive acts or practices within the meaning of CUTPA; and (5) the policies caused class members to suffer financial harm and interfered with their ability to manage their patients' care. Even if we were to assume, without deciding, that each of these elements could be established through generalized proof, such as the introduction of exhibits and the testimony of representative class members and the defendant's employees, we nonetheless conclude that the trial court improperly determined that common issues of law or fact predominate in this case. That is so because the trial court did

state to recover damages." General Statutes § 42-110g (a) provides, however, that only "person[s] who [suffer an] ascertainable loss of money or property . . . as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action" under CUTPA. Thus, CUTPA's "ascertainable loss" threshold applies with equal force to class actions.

not consider that such generalized evidence would not obviate the need to examine each class member's individual position to determine whether he or she suffered an injury in fact and whether the challenged business policies were the cause of that injury. Contrary to the conclusion of the trial court and the assertions of the plaintiffs, the issues requiring individualized proof do not relate merely to the *amount* of damages that each class member has suffered, but also to the defendant's *liability* to each class member with respect to all four causes of action. Although we recognize that other elements of the plaintiffs' claims also will require individualized proof—for example, count two will require the plaintiffs to prove that the defendant actually interfered with a particular class member's relationship with his or her patient—the injury and causation elements alone are so extensive that they substantially outweigh any efficiencies that might be achieved by adjudicating common issues of law or fact in a class action. See *Collins* v. *Anthem Health Plans, Inc.*, supra, 266 Conn. 48–49. We therefore focus our attention on the injury and causation issues that will arise at trial with respect to each of the four subparagraphs for which the trial court ordered class certification.

C

Subparagraphs For Which Trial Court
Granted Class Certification

1

Subparagraph 20 (b)

In subparagraph 20 (b) of their complaint, the plaintiffs alleged that the defendant had failed to provide "consistent medical utilization/quality management and administration of covered services by paying financial incentive[s] and performance bonuses to [primary care] providers and [the defendant's] staff members involved

in making utilization management decisions." Put another way, the plaintiffs claimed that primary care providers and the defendant's employees improperly had denied authorization for covered medical services because of their desire to receive a bonus. As with the other three subparagraphs of their complaint, the plaintiffs claimed that this practice resulted in a breach of the terms of the parties' contracts and of the implied duty of good faith and fair dealing, tortious interference with their business expectancies and a violation of CUTPA.

As we stated previously, the plaintiffs must establish that each class member was harmed by the incentive plan for those class members to be entitled to relief under any of the underlying causes of action. That finding necessarily will entail a review of each medical procedure for which the defendant denied a class member authorization under the incentive program. In particular, the plaintiffs will need to prove that: (1) the class member actually was denied authorization to perform a "covered medical procedure"; (2) the primary care provider or employee who denied authorization was eligible to receive an incentive or bonus; (3) the denial was due to the provider's or employee's desire to obtain an incentive or bonus and was not attributable to another cause, such as the lack of medical necessity or the lack of coverage; and (4) the class member suffered a loss as a result of the denial. Indeed, proving that a particular procedure was even covered by a patient's benefit plan would be a daunting task, as evidenced by an affidavit filed by Eleanor C. Seiler, the defendant's senior medical director. Seiler stated that the defendant "ha[d] in effect in Connecticut thousands of different benefit plans, including varied plans covering members within the same group." She further stated that "[w]hether there is an available benefit and what the specific benefit might be for a particular member in

any given circumstance [depend] upon multiple factors, including, but not limited to, maximum visits limits . . . varying and tiered copayments; benefit differences . . . [and] annual or lifetime benefit limits or maximums . . . . The benefit determination is further subject to a medical necessity review . . . ."

Our conclusion that extensive individualized inquiries would be necessary is supported by the deposition testimony of John M. Keggi, one of the plaintiffs. Keggi admitted that one would need to examine each situation "individually and look at what the benefit is and what the medical treatments and the patient's needs were, to figure out whether something was properly or improperly denied . . . ." In light of the fact that there are 3700 individual providers and 950 groups in the proposed class, we agree with the defendant that "[t]hese necessary yet individualized inquiries would overwhelm any common issues surrounding the [defendant's financial incentive policy]."

The plaintiffs gloss over these injury and causation issues in arguing that the mere existence of the financial incentive program caused each class member to suffer harm and that individualized damage assessments can be computed on the basis of the savings that the defendant realized from the program. Specifically, the plaintiffs posit that a court simply could divide the program savings by the number of patients to derive a "harm per patient" quotient. The harm sustained by each class member then could be computed on the basis of the number of patients that that class member had. What the plaintiffs fail to consider, however, is that each class member's right to recover damages from the defendant under any of the four causes of action is not automatic; rather, it is conditioned on the plaintiffs' ability to prove, inter alia, that that class member suffered harm that was caused by the incentive program. Thus, the method advanced by the plaintiffs essentially amounts to an

end run around the defendant's right to have each class member prove the essential elements of liability. Although it is understandable that the plaintiffs seek the advantages of the class action mechanism, those advantages cannot be conferred at the expense of the defendant's legal rights. See *Kohn* v. *American Housing Foundation, Inc.*, supra, 178 F.R.D. 543. Because the defendant's liability to each class member cannot be determined without extensive individualized findings of causation and harm, common questions of law or fact do not predominate with respect to the allegation contained in subparagraph 20 (b).

2

### Subparagraph 20 (g)

In subparagraph 20 (g), the plaintiffs allege that the defendant "[f]ail[ed] to maintain accurate books and records whereby improper payments to the plaintiffs were made based on claim codes submitted." The plaintiffs have explained that this allegation refers to the defendant's policy of sending to each provider representative, rather than comprehensive, fee schedules that set forth the fees that correspond to the most commonly used billing codes in the provider's area of specialty. Because these schedules do not contain every code, the plaintiffs allege that they submitted claims based on inaccurate codes and, therefore, did not receive the correct payment for services rendered.

At the outset, we note that the defendant's policy likely would have affected class members in markedly different ways because claim codes vary by specialty. It is reasonable to assume that class members who engage in practice areas that involve the performance of a vast array of procedures might have suffered greater harm from the defendant's practice than members whose specialties embrace a more limited range

of services.[10] Indeed, even physicians who share the same specialty will have different experiences, as evidenced by the plaintiffs' deposition testimony in this case. For example, Henry J. Rappoli, the office manager for one of the plaintiffs, Connecticut Family Orthopedics, P.C., testified that he had experienced no problems with the defendant's practice. By contrast, John M. Keggi testified that he had experienced difficulty obtaining codes on at least three or four occasions. We further note that there are legitimate reasons why payment differences may arise from coding issues, including simple clerical error or a reasonable difference of opinion as to how a particular procedure should be coded. Inasmuch as allegedly "improper payments" might be attributable to a multiplicity of causes, and the defendant's practice will have a disparate impact on individual class members, there is no escaping the reality that the determination of causation and injury with respect to the allegation of subparagraph 20 (g) will require substantial individualized fact finding. This conclusion is supported by *Klay* v. *Humana, Inc.,* supra, 382 F.3d 1241, which also involved an action brought by numerous physicians to challenge, inter alia, the coding practices adopted by the defendant health maintenance organizations (HMOs). See id., 1246–48.

The physicians in *Klay* alleged, inter alia, that the HMOs had conspired with each other to program their computers to underpay physicians for their services by manipulating the codes under which the physicians had submitted their claims. Id., 1246. The plaintiffs complained that the HMOs had violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq.; id., 1250; "breached their obligation to pay [the

---

[10] The record indicates that the defendant did not adopt this practice until the late 1990s. Thus, class members who withdrew from the defendant's provider network prior to that time would not have suffered any harm at all from the challenged practice.

physicians] for medically necessary services in accordance with their contractual obligations"; id., 1261; and violated other state laws. Id., 1267. Although the record revealed that the HMOs' code manipulation practices had affected class members in different ways; see id., 1264–65; the District Court nonetheless granted the physicians' motion for class certification as to all counts of the complaint. Id., 1250. The Eleventh Circuit Court of Appeals reversed the class certification order with respect to the state law causes of action "because individualized issues of law or fact predominate[d] over common, classwide issues." Id., 1268. In its discussion of the breach of contract claim, the Court of Appeals stated: "[E]ven if the [physicians] . . . were to establish that the [HMOs] engaged in some or all of the practices at issue, they would still need extensive individualized proof regarding which [physicians] have been harmed and in what ways." Id., 1267. Furthermore, "[t]he facts that the [HMOs] conspired to underpay doctors, and that they programmed their computer systems to frequently do so . . . do nothing to establish that any individual doctor was underpaid on any particular occasion. . . . [Instead] each doctor, for each alleged breach of contract (that is, each alleged underpayment), must prove the services he provided, the request for reimbursement he submitted, the amount to which he was entitled, the amount he actually received, and the insufficiency of the HMO's reasons for denying full payment." (Citations omitted.) Id., 1264. Because any common issues of law or fact would be "dwarfed by the individualized issues of fact to be resolved"; id.; the Court of Appeals concluded that the coding claim was not eligible for class certification. Id., 1265. We reach the same conclusion in the present case because similar individualized inquiries would be necessary to prove that each class member was harmed by the defendant's provision of inaccurate or incomplete code schedules, as alleged in subparagraph 20 (g).

The plaintiffs argue that it is the defendant's policy itself with which the class members take issue because the defendant "chang[es] its claim codes frequently in order to meet the bottom line and therefore inadequately communicates with its doctors." The plaintiffs argue that, because this is a "company-wide policy," common issues necessarily must predominate. This argument misses the mark for three reasons. First, subparagraph 20 (g) does not allege that the defendant does not communicate changes to its claim codes in a timely fashion. Rather, the gravamen of the plaintiffs' allegation is that the defendant does not send its providers a complete list of codes but, rather, sends only a partial list. Second, the plaintiffs essentially conflate the predominance requirement of Practice Book § 9-8 with the commonality requirement of Practice Book § 9-7. We explained in *Collins*, however, that the commonality prerequisite simply requires the existence of a question of law or fact that is common to the class. *Collins* v. *Anthem Health Plans, Inc.*, supra, 266 Conn. 34 ("[t]he commonality requirement is met if [the] plaintiffs' grievances share a common question of law or of fact" [internal quotation marks omitted]). We further stated that the predominance criterion is "far more demanding" in that it requires a probing inquiry to determine whether the common issues that are subject to generalized proof are more substantial than the issues subject only to individualized proof. (Internal quotation marks omitted.) Id., 48. Thus, the plaintiffs' argument simply does not comport with the principles that we announced in *Collins*. Third, the plaintiffs ignore the fact that they must prove causation and injury for each class member for the reasons that we have discussed previously. We therefore reject the plaintiffs' argument and conclude that the allegation set forth in subparagraph 20 (g) does not satisfy the predominance requirement of Practice Book § 9-8.

3

## Subparagraph 20 (m)

Subparagraph 20 (m) of the plaintiffs' complaint alleges that the defendant "fail[ed] to provide senior personnel to work with the plaintiffs or other similarly situated physicians . . . ." As the trial court explained, the crux of this allegation is that "the defendant failed to provide a doctor on call [on] weekends [or nights] for the purpose of preauthorizing procedures, and, [al]though the plaintiffs needed to speak to a doctor to obtain authorization [for the performance of certain procedures], they instead were able to talk only to clerks. [The plaintiffs claimed that] [w]ithout such opportunity for preauthorization . . . they ran the risk of [the] defendant's denial of payment." The record reveals, however, that this practice was in effect only between 1993 and 1996, a fact that the plaintiffs do not dispute. Moreover, Robert Scalettar, a physician who was employed by the defendant, stated in his deposition that the company routinely authorized payment for bona fide emergency procedures after the services had been rendered.

In order for the plaintiffs to prove harm and causation as to each class member for this allegation, they would need to establish, inter alia, that: (1) the class member performed a procedure during the weekend or at night between 1993 and 1996, when the challenged practice was in effect; (2) the procedure was a bona fide emergency procedure that could not have been delayed until after preauthorization was obtained; and (3) payment for the procedure was denied due to a lack of preauthorization, as opposed to some other reason. These issues, too, would require extensive individualized inquiries and are far more substantial than any common issues pertaining to the practice itself.

The plaintiffs' arguments with respect to this subparagraph essentially mirror those advanced for subparagraphs 20 (b) and (g) and, thus, we need not repeat them here. For the reasons set forth in part II B 1 and 2 of this opinion, we conclude that common issues of law or fact do not predominate with respect to subparagraph 20 (g) of the plaintiffs' complaint.

4

Subparagraph 20 (j)

Finally, in subparagraph 20 (j) of their complaint, the plaintiffs allege that the defendant "[made] payment for services dependent on profiling," a practice under which "treatment and/or payment for covered services for the patient is permitted/disallowed in whole or part by the use of statistical averages for the treating physician." (Internal quotation marks omitted.) *Collins* v. *Anthem Health Plans, Inc.*, supra, 266 Conn. 66. It is undisputed that the defendant never has terminated a provider's contract or denied payments due to its profiling practice. Thus, the plaintiffs do not seek monetary damages for this claim; rather, they seek injunctive relief under CUTPA. See General Statutes § 42-110g (d).

We previously have explained that "[t]he ascertainable loss requirement is a threshold barrier which limits the class of persons who may bring a CUTPA action seeking either actual damages or *equitable relief*." (Emphasis added.) *Hinchliffe* v. *American Motors Corp.*, supra, 184 Conn. 615. Although there is no need to allege or to prove the amount of the ascertainable loss, the plaintiffs must show that it is more likely than not that they suffered such a loss as a result of the challenged practice. *Service Road Corp.* v. *Quinn*, 241 Conn. 630, 644, 698 A.2d 258 (1997) (stating that injunctive relief can be obtained under CUTPA "if the plaintiff is able to prove by a preponderance of the evidence that an unfair trade practice has occurred and a reasonable

inference can be drawn by the trier of fact that the unfair trade practice has resulted in a loss to the plaintiff"). Thus, in order for a class member to be entitled to injunctive relief under CUTPA, the plaintiffs must show that: (1) the class member is threatened by the profiling policy; see *Collins* v. *Anthem Health Plans, Inc.*, supra, 266 Conn. 67; and (2) because of that threat, it is more likely than not that the class member has suffered an ascertainable loss. See *Service Road Corp.* v. *Quinn*, supra, 644. Proof of these elements will involve the same type of individualized inquiries of harm and causation that are integral to the plaintiffs' damages claims. For example, we agree with the defendant that, "whether an individual feels afraid or threatened is not the type of fact that can be established on a representative basis using generalized proof. It is uniquely individual and varies from person to person . . . ." Indeed, the deposition testimony of one of the plaintiffs in this case proves that very point. John J. O'Brien testified that he used profiling reports to review how his utilization statistics compared with those of other physicians in his area of specialty. He stated that he had a "good profile" and, therefore, did not need to complain to the defendant about its practice of profiling. Similarly, Ronald Ripps, another plaintiff, stated that he thought profiling was "an important vehicle for cost control." In short, the determination of whether any given class member was threatened by the defendant's practice of profiling and whether that class member sustained an ascertainable loss as a result of that threat requires individualized inquiries and, thus, common questions of law or fact cannot possibly predominate with respect to subparagraph 20 (j).[11]

---

[11] We note that the plaintiffs also seek injunctive relief under CUTPA for the practices alleged in subparagraphs 20 (b), (g) and (m). Because a plaintiff must prove injury and causation to be eligible for injunctive relief under CUTPA, the reasoning set forth in part II B 1, 2 and 3 also would apply to the plaintiffs' claims for injunctive relief.

## III

Finally, the defendant claims that the trial court improperly concluded that the adjudication of this case as a class action would not pose management difficulties for the court. We agree.

In *Collins*, we stated that rule 23 (b) (3) of the Federal Rules of Civil Procedure sets forth a nonexhaustive list of factors that are pertinent to findings of predominance and superiority by the federal courts. *Collins* v. *Anthem Health Plans, Inc.*, supra, 266 Conn. 48–49. These are: "(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; [and] (D) the difficulties likely to be encountered in the management of a class action." Fed. R. Civ. P. 23 (b) (3). The trial court reviewed each of these four factors as an integral part of its predominance analysis and concluded that they all militated in favor of the plaintiffs' maintenance of a class action with respect to the four aforementioned subparagraphs. With respect to the fourth factor, namely, manageability, the court rejected the defendant's prediction that there would be "hundreds—perhaps thousands—of doctors with varying experiences and disparate damage claims 'parading' through the courtroom," reasoning that the trial could be managed in such a way as to avoid that result. Specifically, the court suggested that a trial on the merits could be "bifurcated so that the jury first decides the issue of liability and, only if it finds liability on one or more counts, assessment of damages might be accomplished by dividing the class into subclasses . . . . Alternatively, the parties might agree to a jury determination of liability and a court assessment of damages based upon an

agreed [upon] formulaic basis." Before we address the shortfalls of the trial court's logic, we briefly discuss the interrelationship between predominance, superiority and manageability.

Although the plaintiffs must satisfy both the predominance and superiority requirements of Practice Book § 9-8, these criteria are intertwined; *Jackson* v. *Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1006 n.12 (11th Cir. 1997); and the manageability issue is relevant to both. Once predominance is determined, considerations of superiority and manageability "should fall into their logical place." *In re Catfish Antitrust Litigation*, 826 F. Sup. 1019, 1044 (N.D. Miss. 1993). If the predominance criterion is satisfied, courts generally will find that the class action is a superior mechanism even if it presents management difficulties. See, e.g., id., 1044–45. It also is true, however, that the more individualized issues that predominate, the less superior and more unmanageable a class action will be. See, e.g., *Castano* v. *American Tobacco Co.*, supra, 84 F.3d 745 n.19; see also *Andrews* v. *American Telephone & Telegraph Co.*, 95 F.3d 1014, 1023–25 (11th Cir. 1996) (reversing class certification because predominance of individual legal and factual issues would render class action unmanageable); 2 A. Conte & H. Newberg, supra, § 4:32, p. 283 ("[w]hen a court determines that common questions do not predominate over individual ones . . . [it] is highly likely to find that a class action is also not superior because of the management difficulties posed by the individual questions").

Because the trial court in the present case did not conduct a structured predominance analysis in accordance with established legal standards, it improperly concluded that it would encounter no unusual management difficulties if subparagraphs 20 (b), (g), (j) and (m) were afforded class action status. Had the trial court performed its predominance inquiry correctly, it

would have realized that thousands of physicians will indeed need to " 'parad[e]' through the courtroom" in order to prove injury and causation, which are essential elements of the causes of action asserted by the plaintiffs. Contrary to the assertion of the trial court, the creation of subclasses would do nothing to alleviate the need for exhaustive individualized inquiries that would be tantamount to a mini-trial for each class member. Nor would the "formulaic damage" approach advanced by the trial court be a viable alternative because it would require the defendant to forgo its legal right to have each class member prove the essential elements of liability. For these reasons, we hold that the trial court improperly concluded that the adjudication of subparagraphs 20 (b), (g), (j) and (m) as a class action would not pose management difficulties.

The order is reversed and the case is remanded with direction to deny the plaintiffs' motion for class certification.

In this opinion the other justices concurred.